IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

MICHELLE MCMILLIN,                    )
                                      )
              Plaintiff,              )
                                      )
      v.                              )     Case No.
                                      )     14-4107-CV-C-REL-SSA
CAROLYN W. COLVIN, Acting             )
Commissioner of Social Security,      )
                                      )
              Defendant.              )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Michelle McMillin seeks review of the final decision of the Commissioner

of Social Security denying plaintiff's application for disability benefits under Titles II and

XVI of the Social Security Act ("the Act"). I find that the substantial evidence in the

record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore,

plaintiff's motion for summary judgment will be denied and the decision of the

Commissioner will be affirmed.

## I.    BACKGROUND

On June 1, 2010, plaintiff applied for disability benefits alleging that she had

been disabled since December 28, 2005. Plaintiff's disability stems from anxiety,

bipolar disorder, fibromyalgia, hypothyroidism, chronic pain syndrome, and gastro-

esophageal reflux disease ("GERD") (Tr. at 194). Plaintiff's application was denied on

October 6, 2010. On December 17, 2012, a hearing was held[1] before an Administrative

Law Judge. On February 21, 2013, the ALJ found that plaintiff was not under a

---

[1]Plaintiff requested a continuance of her hearing until she was released from prison
(Tr. at 194).

"disability" as defined in the Act.  On February 24, 2014, the Appeals Council denied plaintiff's request for review.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).  However, the substantial evidence standard presupposes a zone of

choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.    BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled.  These regulations are codified at 20 C.F.R. §§ 404.1501, et seq.  The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.      Is the claimant performing substantial gainful activity?

Yes = not disabled.
No = go to next step.

2.     Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

>       No = not disabled.
>       Yes = go to next step.

3.     Does the impairment meet or equal a listed impairment in Appendix 1?

>       Yes = disabled.
>       No = go to next step.

4.     Does the impairment prevent the claimant from doing past relevant work?

>       No = not disabled.
>       Yes = go to next step where burden shifts to Commissioner.

5.     Does the impairment prevent the claimant from doing any other work?

>       Yes = disabled.
>       No = not disabled.

## IV.     THE RECORD

The record consists of the testimony of plaintiff and vocational expert Susan Hollander, in addition to documentary evidence admitted at the hearing.

## A.     ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

## Earnings Record

The record shows that plaintiff earned the following income from 1989 through 2011:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1989 | $ 189.76 | 2001 | $ 3,980.47 |
| 1990 | 973.59 | 2002 | 49.00 |

4

| 1991 | 2,017.86 | 2003 | 949.62 |
|------|----------|------|--------|
| 1992 | 1,428.47 | 2004 | 8,074.13 |
| 1993 | 3,186.66 | 2005 | 8,531.72 |
| 1994 | 0.00 | 2006 | 3,387.46 |
| 1995 | 4,565.90 | 2007 | 0.00 |
| 1996 | 12,997.19 | 2008 | 0.00 |
| 1997 | 12,748.70 | 2009 | 5,499.19 |
| 1998 | 13,381.86 | 2010 | 2,633.22 |
| 1999 | 14,011.73 | 2011 | 0.00 |
| 2000 | 8,549.69 | | |

(Tr. at 287-288, 292).

Plaintiff's previous employers include Burger King Restaurant (training supervisor and cashier), Long John Silvers Restaurant (manager), Capital City Pizza, St. Peters Catholic Church (after school daycare assistant), Shoeland, several dentists (dental assistant), JRG Management (restaurant), Fraternal Order of Eagles (bartender), Movie Gallery (customer service), and Marshall's (Tr. at 293-299, 330).

**Function Report**

In a Function Report dated July 29, 2008, plaintiff stated that she cared for her son, who was 5 at the time, did housework and laundry, prepared meals, and slept 5 to 7 hours each night with a 60- to 90-minute nap each day (Tr. at 330). Despite stating that she cares for her son, entertains him, interacts with him, does activities with him, bathes him, and assists him in getting dressed, she said that she has trouble dressing

5

herself and bathing, caring for her hair, balancing while shaving, using the toilet, and due to migraines she is "unable to function at all." (Tr. at 338-339). Her boyfriend calls her to make sure she takes her medication (Tr. at 340). Plaintiff was able to do laundry, load the dishwasher, and sweep floors (Tr. at 340). Plaintiff was able to drive a car, but she usually had her boyfriend accompany her when she went out because she sometimes has panic attacks while driving[2] (Tr. at 341). She was able to shop in stores for 30 to 45 minutes once a month (Tr. at 341). Her hobbies included watching television and swimming (Tr. at 342). Plaintiff spent time with her boyfriend and children daily, she went to the creek to swim once or twice a week, the grocery store once or twice a month, and to meet with her caseworker at least once a week (Tr. at 342). Plaintiff has difficulty getting along with authority figures: "I don't like constantly being told what to do - little patience for this." (Tr. at 344).

**Disability Report - Field Office**

During a face-to-face meeting with plaintiff on June 18, 2010, Interviewer J. Stuckenschne observed that plaintiff had no difficulty hearing, reading, breathing, understanding, concentrating, talking, answering, sitting, standing, walking, seeing, using her hands, writing, or with coherency (Tr. at 369-370).

**Function Report**

In a Function Report dated June 23, 2010, plaintiff stated that she cared for her son with help from her boyfriend, she might work a four-hour shift at McDonald's, she

_____

[2]In a Function Report - Third Party, plaintiff's boyfriend stated that plaintiff is able to go out alone (Tr. at 374).

watched television, took a "small nap" each day, helped with dishes, did some laundry, picked up things around the house, and made the bed (Tr. at 386-393). She was able to drive and to go out alone. At McDonald's plaintiff's hands would get stiff and she was unable to count money or hold money properly. She went to see her son play sports once or twice a week. She spent time with her family daily and with others once or twice a week. She can only walk a block at a time before needing to rest for 10 or 15 minutes. Plaintiff noted that it is difficult for her to take orders from others. "Currently have problems w/boss at McDonald's."

**B.     SUMMARY OF MEDICAL RECORDS**

Plaintiff's alleged onset date is December 28, 2005. The first medical record is dated April 8, 2008. On that day, plaintiff had an initial evaluation at Burrell Behavioral Health with Peggy Brothers (Tr. at 619-623). Plaintiff reported having a stressful life. She said she has anger problems and has outbursts. When she gets angry, she goes to the bedroom and smokes marijuana to calm down. Plaintiff reported racing thoughts, mood swings, anxiety, and loss of concentration. Plaintiff said methamphetamine calmed her down and she was able to focus, but if she used too much she would be up for days. Plaintiff said she does not like rules. Plaintiff was 5 feet 2 1/2 inches tall and weighed 150 pounds. She was smoking 3/4 to 1 pack of cigarettes per day and consuming 10 sodas daily. Plaintiff reported lots of chaos at home -- her children do not get along, she does not get along with her kids' father. Plaintiff reported using marijuana now and occasionally using alcohol. She said she got into methampheta-mine and crack cocaine a couple years ago. She got arrested for crack. She had a

7

problem with using cocaine (up to four 8-balls a day in 2002) and went to treatment twice. She stayed clean for six months the first time and five months the second time.

Plaintiff was observed to have adequate grooming and hygiene and casual dress. Her speech was rapid, excessive and loud. She had some loss of train of thought. Plaintiff reported anxiety and some panic attacks. Plaintiff was assessed with bipolar disorder with most recent episode manic, post traumatic stress disorder, and attention deficit hyperactivity disorder. Glenda Burton, M.D., was consulted and met with plaintiff. She prescribed Depakote,[3] Clonidine,[4] and Strattera.[5]

On July 1, 2008, plaintiff was seen at Burrell Behavioral Health (Tr. at 441). Plaintiff was smoking 1 to 1 1/2 marijuana cigarettes daily and drinking 1/5 of rum every other weekend. She was drinking 2 liters or more of Mountain Dew daily and complained of having difficulty with sleeping. Plaintiff described having anxiety, poor concentration, racing thoughts, and poor memory. She was told to use progressive muscle relaxation and anger management, decrease her caffeine intake, and stop using alcohol and drugs. The possibility of "caffeine intoxication" was noted.

On July 28, 2008, plaintiff was seen at Burrell Behavioral Health (Tr. at 442). She said she was doing better, she was calmer, her thoughts were not racing as much. Plaintiff said her boyfriend wanted a child.

---

[3]Treats manic phases of bipolar disorder.

[4]An antihypertensive also used to treat attention deficit hyperactivity disorder.

[5]Treats attention deficit hyperactivity disorder.

8

On August 7, 2008, plaintiff was seen at Burrell Behavioral Health (Tr. at 455-459). "Need assistance with housing, disability, employment, medications, and other health concerns. Meets all objectives as identified and overall functioning has improved." Plaintiff's Axis I assessment was bipolar disorder and marijuana dependence. Her Axis IV assessment was problems with family, job/occupation, housing, economic. Plaintiff indicated that her goal was to be self sufficient. In order to achieve that goal, her objectives, as determined by her counselor, were to do the following: 1) apply for Social Security disability, 2) locate efficient housing, 3) seek employment.

On September 20, 2008, plaintiff was seen at Burrell Behavioral Health (Tr. at 443). Plaintiff was moody and tearful. Most of this record is illegible and appears to be about the problems her kindergartner son was having.

On November 3, 2008, plaintiff was seen at Burrell Behavioral Health (Tr. at 444). Plaintiff reported having slept well the past two nights. Her son had been suspended from school for hitting kids. Plaintiff's mood had been better. She was calm and less tearful with fewer mood swings. Concentration was "so so." Her dose of Celexa (antidepressant) was increased and her Depakote and Wellbutrin (treats depression) were continued.

On January 28, 2009, plaintiff was seen by Reginald Schleider, M.D., in the emergency department at St. Mary's Health Center (Tr. at 537-541). Plaintiff complained of pain in her lower back radiating into her right leg. She had been playing with her son the day before and woke up with pain. Plaintiff reported a long history of

9

chronic back pain. She did not list any pain medications or muscle relaxers as a current medication. Plaintiff was described as pleasant, lying quietly on the hospital gurney, answering questions appropriately and in no acute distress. She had complete range of motion in her neck. She had tenderness in her right lumbar area. Straight leg raising was positive on the right at 30 degrees, positive on the left at 50 degrees. X-rays of the lumbar spine showed mild scoliosis[6] and partial sacralization[7] of the left side of L5 but otherwise normal. Plaintiff was given IV morphine (narcotic). She was assessed with back strain and was given a prescription for Darvocet (narcotic), Flexeril (muscle relaxer), and Naprosyn (non-steroidal anti-inflammatory).

On February 23, 2009, plaintiff was seen at Burrell Behavioral Health (Tr. at 445). She said she was trying to get pregnant. Most of this record is illegible.

On March 23, 2009, plaintiff was seen at Burrell Behavioral Health; however, the record is illegible (Tr. at 446).

On March 27, 2009, plaintiff had a psychosocial/clinical assessment during which she reported smoking 10 cigarettes daily, consuming 4 or 5 alcoholic drinks at a time twice a month, and using a bowl of marijuana three times a week (Tr. at 478). These were listed as "current" substances usages. It was noted that she had "active Medicaid" coverage (Tr. at 480). The assessment states that plaintiff was "currently not working due to her symptoms and lack of transportation." (Tr. at 481). Plaintiff reported that she

---

[6]Scoliosis is a sideways curvature of the spine that occurs most often during the growth spurt just before puberty.

[7]A developmental abnormality in which the first sacral vertebra becomes fused with the fifth lumbar vertebra.

10

was searching for a job. She was able to shop for groceries, cook complex meals, and use food pantries, do dishes, mop, sweep, vacuum, empty the trash, clean the bathroom, and perform some home repair/maintenance, all independently without the need for prompting or assistance; however, due to chronic pain, completing household tasks could be a challenge (Tr. at 483). The form includes the following:

> Describe symptoms, side effects, physical/cognitive impairments or behaviors that impact work performance: <u>Due to client's lack of transportation & unable to find employment client has not worked the past year</u>.

(Tr. at 485).

Plaintiff reported that she watches television, goes outdoors, watches movies at home, and sometimes dances in the community with others (Tr. at 486). She was assessed with bipolar disorder, type 1, depressed; attention deficit hyperactivity disorder; and borderline personality disorder (Tr. at 488). Plaintiff reported that she was trying to get pregnant and had "greatly cut back on substance use." (Tr. at 488).

On April 2, 2009, plaintiff was seen at Burrell Behavioral Health (Tr. at 460-465). "Client continues to report struggles with functioning - mentally and physically." Plaintiff stated that she wanted to find employment. Her obstacles to employment were listed as follows: lack of transportation, lack of job opportunities, "hasn't worked in over two years," and physical pain. It was recommended that plaintiff contact vocational rehabilitation to inquire about job opportunities, complete at least one job application per week, and look into a temporary agency to assist with finding employment. In order to improve her health, plaintiff was told to take her medicine every day, follow up with her health care professionals, and walk at least five times per week for at least a half

11

hour each time to "improve physical health and decrease aches/pains." The counselor indicated that she would teach plaintiff coping and calming techniques to decrease the stress that comes with working, and she recommended that plaintiff "maintain employment and work at least 30 hours a week."

On April 27, 2009, plaintiff was seen at Burrell Behavioral Heath (Tr. at 447). Plaintiff reported that she was trying to get pregnant. She had cut down her soda intake to 2 to 3 cans per day and noted that she had been sleeping 4 1/2 to 5 hours a night, up from her usual 1 or 2 hours at a time.

On April 28, 2009, plaintiff saw Frank Divincenzo, M.D., in the emergency department at St. Mary's Health Center (Tr. at 531-536). Plaintiff took three Thorazine[8] tablets in order to help her sleep, but then developed muscle spasms in her arms and called an ambulance. Ambulance personnel reported that she was drowsy while en route to the hospital. "Upon arrival here she was drowsy and had slurred speech, but she also appeared to be hyperkinetic.[9] The patient had reported that she drank alcohol earlier in the day. . . . According to the patient's family, she has a history of drug use involving multiple substances such as methamphetamines, alcohol, and marijuana. She continues to smoke marijuana on a daily basis." A CT scan of the head was normal. No alcohol was detected in plaintiff's blood. She tested positive for marijuana. She was assessed with probable medication reaction to Thorazine.

---

[8]Treats the manic phase of bipolar disorder. Also treats anxiety and restlessness before surgery.

[9]An abnormal amount of uncontrolled muscular action; spasm.

On May 9, 2009, plaintiff applied for vocational rehabilitation service "to further my education or locate employment" (Tr. at 626-627).

On June 23, 2009, plaintiff was seen by Reginald Schleider, M.D., in the emergency department at St. Mary's Health Center (Tr. at 525-530). She complained of abdominal pain with nausea and vomiting. "The patient states that she did have some cramping over the last 3-4 days but was able to eat. In fact, she went to a barbecue last night and had some thick steaks." Plaintiff reported muscle aches and joint pain secondary to fibromyalgia and back pain on a chronic basis. She did not include any pain medication or muscle relaxers in her list of current medications. Plaintiff was described as a pleasant female lying quietly on the hospital gurney, answering questions in an appropriate manner and in no acute distress. She had complete range of motion in her neck. "Tenderness appears to be equal in the upper and lower quandrants but on repeat examination, she appears to be more tender in the right lower quadrant than in the upper

quadrants. Her abdominal examination seems to change at various times." She had no **costovertebral angle ("CVA")** tenderness in her back. A CT scan showed no evidence of appendicitis.



"Exact etiology of the patient's abdominal pain is not clearly understood." Plaintiff was

given a prescription for Vicodin (narcotic) for pain and a note to be off work for two days.

On July 28, 2009, plaintiff was seen at Burrell Behavioral Health (Tr. at 448). Plaintiff said she was trying to get pregnant. She was told to avoid alcohol. The majority of this record is illegible.

On August 16, 2009, plaintiff was seen by Dean Breshears, M.D., in the emergency room at St. Mary's Health Center (Tr. at 521-524). Plaintiff said she dropped a 27-inch television set on her right foot the day before. Plaintiff reported bipolar disorder and hypothyroidism as her only medical conditions. Her current medications did not include narcotics, pain medication or muscle relaxers. "She did work from 6 a.m. to 2 p.m. today" -- an 8-hour shift. X-rays were normal. She was assessed with "crush wound" to the right foot and was given a prescription for Darvocet (narcotic) #30 with no refills and a note to be off work for two days.

On September 1, 2009, plaintiff was seen at Burrell Behavioral Health; however, the record is illegible (Tr. at 449).

On October 6, 2009, plaintiff was see at Burrell Behavioral Health (Tr. at 450). Plaintiff complained that she was having memory problems, she was "zoned out," she was easily distracted, she was not getting things done, she was unable to sustain attention, she was disorganized and was losing things. She said she missed her son's ball game because of her disorganization. She was working at a restaurant. She said she last used methamphetamine or cocaine three years earlier. Strattera (treats ADHD) was prescribed and plaintiff was told to continue her other medications.

14

On December 13, 2009, plaintiff was seen by Reginald Schleider, M.D., in the emergency department at St. Mary's Health Center (Tr. at 515-520).  Plaintiff said she fell two days earlier and had been having persistent right-sided back pain.  "She took one of her friend's Percocet [narcotic] and finally was able to ambulate."  Plaintiff did not have pain radiating to the legs.  X-rays showed no evidence of lumbar spine fracture. She had mild lumbar spondyloarthropathy[10] with mild disk space narrowing at L3-4, L4-5 and L5-S1.  Plaintiff included Hydrocodone (narcotic) and Tramadol (also called Ultram, a narcotic-like pain reliever) in her list of current medications.  "She occasionally drinks alcohol. She smokes 1/2 pack of cigarettes a day. She denies the use of any illicit drugs."  She was assessed with lumbar strain.  She was given Darvocet (narcotic) and Flexeril (muscle relaxer) and told to follow up with her primary care doctor.

On February 23, 2010, plaintiff was seen at Burrell Behavioral Health (Tr. at 490, 451-509).  She was observed to be casually dressed with good hygiene and adequate grooming, she was fully oriented and "attentive at times."  Plaintiff reported that her medications are helpful but she is tired all the time. She usually has enough money to pay for medications, she sees a psychiatrist on a regular basis, she usually takes her medications as prescribed.  She said she is unable to focus and complete tasks, and she feels overwhelmed.  Plaintiff continued to use marijuana and alcohol (Tr. at 496).

---

[10]Spondyloarthropathies are a group of arthritic diseases that share several common features. They can cause inflammation of the spine; however, other joints may be affected. The tendon and ligament tissue near the spine or joint is also involved. A high percentage of people with these diseases share a similar gene called HLA B27. Finally, many patients also have inflamed areas in the eye, bowel, genital tract or skin. http://my.clevelandclinic.org/health/diseases_conditions/hic_Spondyloarthropathy

The record states that plaintiff has "active Medicaid" benefits (Tr. at 499). She was working part time at McDonald's. She said she was searching for another job because she needed more income. Plaintiff reported being able to independently do dishes, mop, sweep, vacuum, empty the trash, clean the bathroom, and keep her belongings in order; however, her boyfriend did a lot of these things because he was not working and plaintiff was "going to school and working." (Tr. at 502). She was attending Metro Business College taking refresher classes for four hours, three nights per week (Tr. at 503). She was going to a community health club three or four times a week by herself, and she was spending time at a pool hall/bar with others on a weekly basis (Tr. at 505). Plaintiff said she "wants more money and gas to do things. Money to pay a babysitter. Does not want to participate in community activities or any organizations. Just wants more money to get out." (Tr. at 505). Plaintiff's caseworker wrote:

> Client has now received services from this clinic for about 2 years and has well documented history of symptoms and behaviors. She continues to suffer from depressive symptoms, as well as the occasional manic episode. Her ADHD symptoms are problematic for her daily, as she finds it difficult to stay on task, stay focused and finish anything she starts. She does state she is less hypervigilent and avoidant than she has been in the past, though still feels she re-experiences trauma. . . . Parenting has been difficult for client, as she was using drugs and alcohol throughout much of her daughter's life. She now only smokes marijuana, on occasion, by report, and drinks socially. . . . Physical health is also an area of concern for client. . . . She is hoping that 3-4 trips to the gym per week and massages will help her overcome some of her disability.

The caseworker recommended that plaintiff search for a more permanent job and continue going to the gym to work out at least three times a week. The staff psychiatrist signed this assessment in agreement (Tr. at 509). The doctor assessed plaintiff as "stable overall, plans to get pregnant, wants to try to decrease meds".

16

Plaintiff was told to increase Strattera, taper off the Depakote, and continue Lithium.[11] The rest of the doctor's record is illegible.

On April 5, 2010, plaintiff was seen by Thomas Nittler, M.D., in the emergency room at St. Mary's Health Center (Tr. at 510-514). Plaintiff said she was putting on a shirt when she turned her head and lifted her arm at the same time and felt something pop in her neck, causing pain radiating from the left part of her neck through her **trapezius muscle** to her shoulder and down her back.



Plaintiff said she had fibromyalgia, but she did not normally have fibromyalgia pain in her neck. "She initially stated to me that she ran out of her pain medications, which included Darvocet [narcotic], yesterday but then later she stated that she did not run out of her Darvocet but that it no longer worked for her." Plaintiff said she was on Darvocet-N 100, Soma (muscle relaxer), and Ultram (narcotic-like pain reliever) for pain. "Patient states she drinks alcohol rarely, does smoke cigarettes. She denies any drugs. . . . Review of systems is reviewed and is entirely negative except as per history of present illness."

Plaintiff had normal range of motion with tenderness on the left side of her neck. Strength was normal in all extremities; she had a steady gait.

The patient had requested strongly something for pain while here in the emergency department. I asked the patient if she had a ride. She states she did but they are not here present currently and are waiting for her outside but the

___

[11]Treats mania that is part of bipolar disorder.

patient was holding the car keys and her vehicle was parked outside with no one inside according to nursing who went to look and see if her ride was present. She continued to request something for pain prior to leaving though we instructed her that we would not be able to do this unless she was able to get a ride. She states subsequently that she would rather just go. Initially the patient had told me that she was out of her Darvocet and that she had been waiting for the pharmacy to open to get one of the refills but then, subsequently, she stated that the Darvocet was no longer working for her. Therefore, I prescribed her a short course of Vicodin [narcotic] #30 no refills, as well as Flexeril [muscle relaxer] #30 no refills.

Plaintiff was assessed with cervical strain. "I am somewhat concerned about several factors in the patient's history. At this point it does not seem that the patient has become a frequent visitor requesting pain medication though I certainly see some aspect of her history which could suggest that this may become a tendency. The patient was encouraged to follow up with her regular physician and I am certainly always happy to give the patient the benefit of the doubt today but I would certainly be hesitant to give her any narcotic pain medication here in the emergency department without visualizing a ride as she appeared to attempt to dispute us regarding this point. I have discussed this with the patient and she states she understands."

On May 4, 2010, plaintiff was seen at Burrell Behavioral Health for a three-month follow up (Tr. at 452). This record is illegible. Plaintiff's Strattera dose was increased.

On June 8, 2010, plaintiff saw Albert Shaw, M.D., for a two-month follow up (Tr. at 453-454, 585-586). Plaintiff weighed 158 pounds. Plaintiff had been trying to lose weight and said "everything's been working great." She said she was still having memory problems, such as forgetting what she was doing or why she was going to a room. Plaintiff was only getting four hours a week at work. She was trying to quit

Case 2:14-cv-04107-REL   Document 22   Filed 05/29/15   Page 18 of 48

smoking and was down to 4 cigarettes a day. She was walking a quarter-mile track for exercise and had tried using dumbbells but got very sore.  She was sleeping poorly and reported being drowsy all day.  Plaintiff reported "that she is really relaxed overall" but that she takes what her boyfriend says the wrong way.  Dr. Shaw noted that plaintiff was calmer and had improved thought process but continued to have hypomanic symptoms.  She had a "more stable mood overall" but with continued lability (susceptible to change).  He specifically noted no side effects from her medication.  She was alert and oriented, she dressed OK, her eye contact was good.  She was very tangential and distractible and lost track of the conversation a few times.  Her affect was mostly bright, her mood was variable but "ok at this point."  He increased her Risperdal (treats bipolar disorder) to 3 mg at bedtime.  She was told to continue working on finding housing, getting SSI, and getting Medicaid.

On June 15, 2010, plaintiff was seen at Fulton Medical Clinic (Tr. at 596-597).  She weighed 156 pounds.  "Pt is doing ok.  GERD is stable.  Doing the Bariatric program.  Trying to do low carb. Trying to do exercise daily.  Doing the walking 1/2 hour daily."  On exam she had no costovertebral angle tenderness.  Plaintiff said she was trying to do weight training.  Her GERD medication was changed.

On July 15, 2010, plaintiff was seen at Fulton Medical Clinic for a one-month follow up (Tr. at 594-595).  She weighed 156 pounds.  Her pain was noted to be "0/10".  Plaintiff was trying to lose weight and had been walking 5 to 6 times per week, 30 minutes per day.  The majority of this record is illegible.

On August 10, 2010, plaintiff saw Albert Shaw, M.D., a psychiatrist (Tr. at 587-588). Plaintiff said, "I'm single now." Her "ex" relapsed on methamphetamine and beat her son with the armrest of a chair. He was charged with child abuse. "She may have some charges also, depending on how things go." Plaintiff's son was living with plaintiff's sister, and plaintiff could only have supervised visits. Plaintiff's son was 7 years old. Plaintiff said she was more emotional now that she was by herself and without a husband or a son. She was mainly having crying spells. "She gets overwhelmed with the chores that her ex used to do." Plaintiff was down to 153 pounds, intentionally losing weight, "walking 1 mile at a time 3-5 times a week" despite fibromyalgia pain. She reported continued memory problems. Plaintiff said the recent stress had made her mood worse. "Felt meds were ok before the recent stress." Dr. Shaw observed that plaintiff was alert and oriented, she was dressed appropriately, she was talkative, her eye contact was OK, her mood was down. "Seem[s] that her focus is better today." He made no changes to her medications.

On August 19, 2010, plaintiff was seen at Fulton Medical Clinic for a one-month follow up on medications and weight (Tr. at 592-593). "Pt is doing well. Lost about 10 lbs. ↓ 2 inches off the waist. . . . Pt states otherwise she is doing well." On exam plaintiff had no tenderness in her back. She was assessed with gastroesophageal reflux disease and urinary tract infection.

On September 21, 2010, plaintiff was seen at Fulton Medical Clinic (Tr. at 590-591). She weighed 158 pounds. She was assessed with gastroesophageal reflux disease, urinary tract infection, chronic pain syndrome which was noted to be stable,

and bipolar disorder. Plaintiff said she was going to walk daily in her attempt to lose weight.

On October 4, 2010, Mark Altomari, Ph.D., a nonexamining psychologist, completed a mental residual functional capacity assessment (Tr. at 604-606). He found that plaintiff was moderately limited in her ability to understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods; and interact appropriately with the general public. She was not significantly limited in any other category. Dr. Altomari also completed a psychiatric review technique finding that plaintiff had mild restriction of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no repeated episodes of decompensation (Tr. at 607-618).

On December 7, 2010, plaintiff was seen by Albert Shaw, M.D., a psychiatrist at Burrell Behavioral Health (Tr. at 667-668). Plaintiff was happy that her incarcerated boyfriend was being moved to a facility in Booneville which would permit her to visit him more often. Plaintiff reported restless sleep "which she attributes to not having anyone in the house with her." She said her concentration was distracted, her energy and interest were "so-so." Plaintiff was told to continue riding her bike and doing stretches. Plaintiff was observed to look tired, but she said she was just getting over the flu which she had for two weeks. Her mood was "mildly depressed although she related this more to her boyfriend being incarcerated than anything else." Dr. Shaw made no medication changes.

On January 5, 2011, plaintiff was seen by Sara Revelle, a nurse practitioner (Tr. at 682, 689-690). Plaintiff stated that she had two children, 17 and 8. "She would like to pursue pregnancy. She has a history of bipolar disease as well as fibromyalgia. She is on many medications that would not be appropriate to take during pregnancy but without her medications she is not controlled." Her exam was normal. "I did advise the patient that I do not recommend pregnancy for her due to her history of bipolar disease and her need for many medications in order to be functional. I told her that if she is adamant about pursuing pregnancy, she would have to talk to her psychiatrist about what medications she could be on. She said she did talk to her psychiatrist and her understanding was that he told her when she became pregnant, to let him know right away so they could do some other medications. Once again, I emphasized to her that I feel that pregnancy is not in her best overall health interest."

On January 12, 2011, plaintiff was seen at Callaway Community Hospital (Tr. at 687-688). She asked for a shot in her back or an increase or change in pain medication. Plaintiff said she had never been to an orthopedic specialist. Plaintiff continued to smoke. She reported being stressed because her boyfriend was in jail. Plaintiff had x-rays of her thoracic and lumbar spine (Tr. at 669-670). She had minimal scoliosis, minimal spondylosis (degeneration of the spine). She was given a prescription for Tramadol (also called Ultram, a narcotic-like pain reliever) and Lidocaine patches (treats pain by numbing the area).

On February 10, 2011, plaintiff was seen at Callaway Community Hospital for a follow up (Tr. at 685-686). Plaintiff said she could not afford Phentermine, a weight loss

medication.  Plaintiff was trying to decrease her carbohydrate intake and exercise more, but she said it was hard to lose weight.  She continued to smoke.  She was trying to ride her bike for 15 minutes a day.  Her irritable bowel syndrome was improving.

On February 22, 2011, plaintiff saw Albert Shaw, M.D., a psychiatrist at Burrell Behavioral Health (Tr. at 665-666).  Plaintiff had been forgetting to take her medications, averaging about 3 or 4 times a week.  Plaintiff said she had lifted her son which made her back go out.  Plaintiff reported having memory problems, and described herself as scatterbrained.  She was planning to use an online process to facilitate an adoption of her son by her boyfriend.  Dr. Shaw observed that plaintiff was alert and oriented, talkative and cooperative. She was dressed appropriately, had good eye contact, "does not appear tired like last time, mood is OK, affect is bright."  Plaintiff was told to take her medication regularly.

On March 9, 2011, plaintiff was seen at Callaway Community Hospital for gastrointestinal issues (Tr. at 683-684).

On March 16, 2011, plaintiff was seen at Burrell Behavioral Health for a comprehensive clinical assessment (Tr. at 628-658).  Plaintiff indicated that she sometimes was not able to afford her medication.  Her boyfriend of three years had recently come back into the home after having been incarcerated for 8 months for physically abusing plaintiff's young son.  Plaintiff planned to marry her boyfriend in about 2 1/2 months.  "She states that her spine is fusing together and [she] may be in a wheelchair in 10-15 years.  [Her boyfriend] had been massaging her and was making her feel better, but she had been without her relief when he was incarcerated."  Plaintiff

23

reported having nightmares about losing her son. Plaintiff's past mental health and substance abuse treatment was reviewed, and it was noted that she was not compliant with previous treatment (Tr. at 632). Plaintiff reported that when she was in high school, she beat several girls and tied one to the bumper of her car, dragging her for about one block. Plaintiff had been "very angry due to all the trauma in her life." Plaintiff reported using marijuana daily (Tr. at 633). Her longest dry period averaged about 96 days. Her drug dependence was evaluated. She was noted to use drugs excessively, she was preoccupied with drug use, it resulted in diminished role functioning, and she used drugs despite the consequences. Her drug abuse interfered with her functioning, she used drugs in hazardous situations, she had substance related legal problems.

Plaintiff began using methamphetamine at age 22. She had used it twice per month but said she had not used it in the past five years (Tr. at 633). Her methamphet-amine use was noted to interfere with her functioning, she used it in hazardous situations, it resulted in substance-related interpersonal conflict, she was preoccupied with use, she used it despite the consequences and despite trying to cut down or control her use.

Plaintiff reported using cocaine for the first time at age 13. She used it about every other day, and typically consumed four 8-balls per day. She said she last used cocaine 9 years earlier. This drug too was noted to interfere with her functioning, she was preoccupied with use, she used it in hazardous situations, it resulted in substance-related interpersonal conflict.

Plaintiff reported drinking a fifth of liquor at a time and said she used alcohol about every other day. As with the other drugs, she was noted to be preoccupied with use, it diminished her role functioning, it interfered with her functioning, it resulted in substance-related interpersonal conflict. Plaintiff said she last used alcohol the previous September, or about six months ago.

Plaintiff was living off $200 per month in child support and multiple forms of government assistance. She reported that she was unable to maintain her job at McDonald's because she was unable to get along with others (Tr. at 639). "Client has been able to utilize Medicaid, food stamps, food banks and local churches." (Tr. at 641). Plaintiff rated her health as "good" (Tr. at 642). She said that she was currently walking and using a stationary bike for exercise (Tr. at 645).

Plaintiff was observed to have normal appearance. She was fully oriented. She was alert, awake, fully aware, responsive, and had adequate motivation and interest in the evaluation. Her mood was euthymic (normal), and her affect was appropriate. She had no difficulty with her attention span (Tr. at 648). Her speech was normal. Plaintiff reported memory problems, but none were noted by the examiner (Tr. at 649). Her mood was "good with bright affect." She was "quite talkative and easily distractible." "Shelley has been prone to blame her son and others around her for consequences such as [her boyfriend] going to jail. She is seldom motivated to make any behavioral changes due to the amount of time and effort involved and physical pain is a large part of her reluctance as well." (Tr. at 653).

Case 2:14-cv-04107-REL   Document 22   Filed 05/29/15   Page 25 of 48

On April 6, 2011, plaintiff was seen at Callaway Community Hospital for a follow up and medication refills (Tr. at 680-681).

On May 12, 2011, plaintiff was seen at Callaway Community Hospital for a follow up (Tr. at 678-679). She was smoking a half a pack of cigarettes per day. Her GERD medication was increased.

On May 31, 2011, plaintiff saw Albert Shaw, M.D., a psychiatrist at Burrell Behavioral Health (Tr. at 663-664). Plaintiff reported taking her Lithium "at least 6/7 nights a week" and felt it was helping. She was waking up after only 5 to 6 hours of sleep around two times per week. Her energy level was "OK - improved from before. Her back is doing better - she has stopped picking up her son." Plaintiff's boyfriend was doing the housework, she did the laundry. She continued to ride her bicycle some but not very often. She rode her bike and walked this day, though. She had been walking around the track around a football field. "Still wakes up very stiff - exercise helps." "Fingers swell overnight - goes down during the day." Dr. Shaw observed that plaintiff was alert and oriented with good eye contact. She was talkative and cooperative. She was dressed appropriately. Her mood was OK, her affect was congruent. He made no medication changes.

On August 10, 2011, plaintiff was seen at Callaway Community Hospital for a three-month follow up (Tr. at 676-677). She reported ear pain. She was smoking a half a pack of cigarettes per day.

On August 26, 2011, plaintiff saw Albert Shaw, M.D., a psychiatrist at Burrell Behavioral Health (Tr. at 659-662). Plaintiff reported continued sleep problems and low

26

energy.  Anxiety prevented her from being around others -- she left her home to go to the doctor and get groceries only.  "Waiting for appeal for disability."  Plaintiff continued riding her bike a little.  She said she stopped her diet pill due to the cost and had gained some weight.  Dr. Shaw observed that plaintiff was alert and oriented with good eye contact.  She was cooperative, dressed appropriately, and her mood was "pretty good" with congruent affect.  Because of plaintiff's weight gain, Dr. Shaw told her to decrease her Risperdal and noted that she may need to increase her Lithium as a result.

On December 19, 2011, plaintiff's records from the Missouri Department of Corrections reflect that she last used marijuana and methamphetamine three months earlier (Tr. at 697).

On January 6, 2012, plaintiff had a nurse encounter due to complaint of lower back pain radiating into her hip and leg (Tr. at 715-716, 719-720).  Plaintiff said a couple days earlier her back started hurting, it was aggravated by being up moving around.  Her gait was steady but slow due to pain, she had equal strength in her extremities, her range of motion was normal.  Plaintiff was told to take over-the-counter Tylenol and over-the-counter Ibuprofen, and she was given a 25-pound weight restriction for five days.

On January 11, 2012, plaintiff was seen again, reporting that her back pain was no better (Tr. at 722-723).  Plaintiff was unable to stoop to the floor, unable to flex at the hips fully without limitation due to pain. Range of motion was limited in the hips and knees due to pain.  She was told to take 600 mg of Ibuprofen (over-the-counter strength is 200 mg) three times a day for ten days.

27

On February 2, 2012, plaintiff had a nurse encounter and described her back pain as a 10 out of 10 (Tr. at 737-738). Plaintiff's gait was steady and she was able to bend forward at the waist 60 degrees. She was told to continue following the doctor's previous treatment recommendations.

On February 13, 2012, plaintiff began refusing Risperdone while in prison because she said it made her tired (Tr. at 743). Plaintiff testified she was falling asleep in her treatment program and if she fell asleep too many times she would get written up and kicked out of the program, which could jeopardize her 120-day sentence as opposed to the 15 years she had originally been given (Tr. at 57-58).

On May 1, 2012, plaintiff was seen at Callaway Community Hospital for medication refills after her release from prison (Tr. at 674-675). Plaintiff said she needed medication from the $4 list and she requested Tramadol for her fibromyalgia. "Pt has been stable. Pt recently went to prison. Pt states she is doing well. Pt states she was [illegible] to jail for 120 days." Plaintiff was smoking one pack of cigarettes per day. She was assessed with fibromyalgia and chronic pain. She was given a prescription for Tramadol, and other medications were refilled.

On June 27, 2012, plaintiff was seen at Burrell Behavioral Health for an addiction assessment (Tr. at 779-793). Plaintiff reported that she was on probation for manufacturing methamphetamine with children in the home and in a school zone and her probation officer wanted her to get drug abuse treatment (Tr. at 793). Plaintiff continued to smoke cigarettes and indicated that she was not planning to stop (Tr. at 783). Plaintiff was noted to be anxious and had to be redirected on several occasions.

28

Plaintiff's motivation for treatment "appears to be both internal and external." The plan was to formulate a treatment program for plaintiff.

On July 11, 2012, plaintiff was seen at Burrell Behavioral Health to go over her drug abuse treatment plan (Tr. at 794).

On August 1, 2012, plaintiff was seen at Callaway Community Hospital for a three-month follow up (Tr. at 672-673). Plaintiff reported continuing to have pain, but she was noted to be stable. Plaintiff said she was unable to afford her medications. She was given samples of Lyrica (treats fibromyalgia) and Lidocaine patches. Plaintiff's Tramadol was increased.

On August 30, 2012, plaintiff was seen at Burrell Behavioral Health to begin outpatient treatment as a condition of probation (Tr. at 773-778). Plaintiff said she was convicted of using her home to manufacture methamphetamine (Tr. at 777). She reported being depressed in prison after she was taken off her fibromyalgia medication. She denied any bipolar symptoms. Plaintiff reported possible visual hallucinations in the past but "was using drugs at the time." Plaintiff reported that by age 11 she was using drugs every day. She said she last used drugs and alcohol in October 2011. Plaintiff's appearance was normal, her behavior was appropriate, mood was euthymic and bright, affect was normal and full. Plaintiff's speech was normal, she was alert, her cognition and memory were noted to be normal. She had fair insight, fair judgment. She showed no evidence of mania. She exhibited excessive worrying. She was observed to have no symptoms of post traumatic stress disorder, no obsessive compulsive diagnosis, and no attention deficit hyperactivity disorder (Tr. at 777).

Case 2:14-cv-04107-REL   Document 22   Filed 05/29/15   Page 29 of 48

She reported suffering a conviction in 1999 for possession of drugs and paraphernalia, and a third degree assault conviction in 2011 for which she was sentenced to seven months in custody (Tr. at 777). Plaintiff was assessed with polysubstance dependence in partial sustained remission, major depressive disorder recurrent moderate without psychosis, and generalized anxiety disorder. Her Axis II diagnosis was cluster B traits.[12]

Plaintiff was seen for counseling on July 25, 2012; August 8, 2012; August 22, 2012; and September 5, 2015 (Tr. at 795-799).

### C. SUMMARY OF TESTIMONY

During the December 17, 2012, hearing, plaintiff testified; and Susan Hollander, a vocational expert, testified at the request of the ALJ.

### 1. Plaintiff's testimony.

At the time of the hearing plaintiff was 38 years of age and was living with her 18-year-old niece and her niece's 18-month-old son (Tr. at 36). Plaintiff's niece works, but plaintiff does not care for the child while her niece is at work, her sister does (Tr. at 36). Plaintiff has a GED and an associate's degree in business management (Tr. at 36-37). She earned that degree in 2002 but never used it because she was not able to find a job (Tr. at 37).

---

[12]Cluster B is called the dramatic, emotional, and erratic cluster. It includes Borderline Personality Disorder, Narcissistic Personality Disorder, Histrionic Personality Disorder, and Antisocial Personality Disorder. Disorders in this cluster share problems with impulse control and emotional regulation.

In 2010 plaintiff was working for McDonald's (Tr. at 37). Prior to that she had not worked in three or four years (Tr. at 37). She was put on several different positions but she was not able to do the lifting or bending, so they stopped scheduling her for more than a couple of hours per month (Tr. at 37). She worked at McDonald's from May 2009 to June 2010 when she applied for disability (Tr. at 38). Plaintiff worked at most 18 hours per week at McDonald's (Tr. at 42). When she was put in the drive through, she would have panic attacks (Tr. at 42-43). "I was in pain and then the anxiety combined with the pain would freak me out." (Tr. at 43).

Plaintiff has been supported by her mother, her sister, and her niece (Tr. at 39). Plaintiff was incarcerated from December 2011 through mid April 2012 for manufacturing drugs (Tr. at 39). She was sentenced to 15 years in prison, but she served a 120-day period of incarceration followed by 5 years of probation (Tr. at 56). Plaintiff applied for disability benefits in June 2010 after her caseworker from Burrell Behavioral Health told her it might be a good time for her to apply (Tr. at 40). Plaintiff had applied for disability benefits twice in the past for the same impairments she listed in her current application (Tr. at 40). Plaintiff does not believe she can work full time due to her anxiety and her daily pain (Tr. at 40).

Plaintiff suffers from lower back pain constantly (Tr. at 40-41). It shoots down the back of her legs and up her back (Tr. at 41). Standing too long, walking too far, bending over, and everyday moving aggravates her pain (Tr. at 41). Plaintiff can stand or walk for 30 to 45 minutes at a time before her pain starts to bother her (Tr. at 41). Plaintiff was told by a prison doctor that there is something fused together that is not

supposed to be, and that it will only get worse with time (Tr. at 41-42). Plaintiff's pain began in 2005 but was gradual, not due to an injury (Tr. at 42). To relieve her pain, she sits down or lies down; she uses massage pillows, a heating pad, and hand-held massagers; and she takes Ultram which helps a little bit and does not cause any side effects (Tr. at 43-44).

Plaintiff also has pain in her knees (Tr. at 44). She gets sharp pain in her knees two to three times per week (Tr. at 44). Plaintiff has tried using heat and cold and she has tried knee braces (Tr. at 44). She also has fibromyalgia and degenerative arthritis in her hips and joints (Tr. at 44). These impairments were diagnosed four years earlier (Tr. at 44). These conditions cause daily pain (Tr. at 45). Plaintiff takes her medication as prescribed and does self-massage and uses heating pads (Tr. at 45).

All of plaintiff's impairments make physical activities difficult (Tr. at 45). When asked what is difficult for her, she said, "Just about everything, I mean it's -- I can't hardly bend over to pick stuff up. I can't sit too long. I can't stand too long. I can't walk too far. I can't -- you know, like my nieces, and nephews, and my son, I can't pick them up, I can't do anything like that." (Tr. at 45). Plaintiff testified that she can sit for 30 to 40 minutes before her back pain gets too bad (Tr. at 45), but she later testified that she could sit for 45 minutes at a time (Tr. at 59). Plaintiff drove the 40 minutes to the hearing but she stopped twice along the way due to lower back pain (Tr. at 45-46).

Plaintiff has had anxiety off and on her entire life (Tr. at 46). Plaintiff took medication before she was incarcerated and took it after she was incarcerated, but she did not take it while she was incarcerated because it made her too sleepy (Tr. at 46).

Plaintiff was taking her anxiety medication while she was working at McDonald's (Tr. at 46-47). Her medication does relieve some of her anxiety, but it makes her very tired (Tr. at 47). Plaintiff cannot be around too many people at a time, big crowds stress her out, she cannot be in charge of something or she has panic attacks (Tr. at 47). Her doctor just tells her to continue taking her medication and that "if it gets worse to let him know, that we'll try something else." (Tr. at 47). Even if plaintiff did not have any physical problems, she could not work because of her anxiety (Tr. at 48). She cannot be around people or be responsible for the tasks at hand (Tr. at 48). When asked to explain how she could not be responsible for tasks, she said telling people what to do and performing paperwork cause too much stress (Tr. at 48-49). Her family stresses her out -- "the kids fighting, arguing, and stuff like that and I can't -- I get to the point where I have outbursts and I can't control the screaming that I do." (Tr. at 49).

Plaintiff used her anxiety medication for the first half of her period of incarceration (Tr. at 57). She started refusing her medication in mid-February (Tr. at 57). She testified that her doctor had been reducing her dosage and then when it stopped working plaintiff asked to be taken off it (Tr. at 57). Her doctor said the only way for her to get off her medication was for her to refuse it for 30 days (Tr. at 57). The dosage was reduced and she refused her medication because it made her so drowsy she would doze off while sitting in treatment (Tr. at 57-58). If she fell asleep in treatment, she would be written up, and multiple write-ups would lead to being kicked out of the treatment program (Tr. at 57-58).

Case 2:14-cv-04107-REL   Document 22   Filed 05/29/15   Page 33 of 48

On a typical day, plaintiff goes to her sister's house so that she is not home alone during the day while her niece is at work (Tr. at 49). Her niece works full-time at McDonald's and goes to college full time (Tr. at 49). Plaintiff goes to her sister's house and helps her with plaintiff's son who is 9 years old (Tr. at 49). After her son gets on the school bus, plaintiff lies down for three or four hours (Tr. at 49-50). She gets up to eat, then lies back down (Tr. at 50). She stays at her sister's all day (Tr. at 50). When her sister leaves for work at 11:00 p.m., she takes plaintiff back to the niece's house where plaintiff spends the night (Tr. at 50). Plaintiff passes the time reading and watching television (Tr. at 50). She gets on the computer about once a week to check her Facebook account (Tr. at 50-51).

Since plaintiff was released from prison, she has been to see her parole officer, she has been to outpatient treatment at Family Counseling Center, and she has been to see her doctor in Fulton (Tr. at 51-52). Plaintiff's sister has custody of plaintiff's son, and plaintiff never goes to his school (Tr. at 52). Her niece does all of the grocery shopping (Tr. at 52). Plaintiff testified that being around people "freaks" her out, and her symptoms were the same before she went to prison (Tr. at 52-53).

Plaintiff has used methamphetamine since her alleged onset date (Tr. at 53). She last used that drug in October 2010[13] (Tr. at 53). Plaintiff did not leave her home to get drugs, other people would come over to her house and get her high (Tr. at 53-54).

---

[13]In the medical records plaintiff reported last using methamphetamine in October 2011, not October 2010.

Plaintiff never paid for the drugs she used (Tr. at 53-54). Plaintiff used methampheta-mine while she was working at McDonald's (Tr. at 54-55).

Plaintiff has used Lithium for the past four or five years (Tr. at 58). She has no problems with this medication (Tr. at 58).

Plaintiff's hands will sometimes lock up where she cannot close them (Tr. at 59). Her doctor said that is related to arthritis, and she was advised to use heat and a muscle relaxing cream (Tr. at 59). She experiences these hand cramps one to three times a day, especially if she holds her hand a certain way too long or tries to write (Tr. at 59).

**2. Vocational expert testimony.**

Vocational expert Susan Hollander testified at the request of the Administrative Law Judge. The first hypothetical involved a person who could lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently; stand and walk for 6 hours per day; sit for 6 hours per day; could occasionally climb ramps and stairs but could never climb ladders, ropes, or scaffolds; could occasionally stoop, kneel, crouch, or crawl; could frequently handle and finger; would need to avoid hazards such as dangerous machinery and unprotected heights; could perform simple and routine tasks with no more than occasional interaction with the general public (Tr. at 61-62). Such a person could work as a laundry classifier, DOT 361.687-014, light, unskilled with an SVP of 2, with 1,492 positions in Missouri and 78,523 in the country; a fruit distributor, DOT 921.685-046, light, unskilled with an SVP of 2, with 1,916 positions in Missouri and 51,283 in the country; or a small products assembler, DOT 706.684-022, light, unskilled

with an SVP of 2, with 1,149 positions in Missouri and 35,402 in the country (Tr. at 62-63).

## V.    FINDINGS OF THE ALJ

Administrative Law Judge Dennis LeBlanc entered his opinion on February 21, 2013 (Tr. at 12-23).  "The claimant filed two prior sets of applications for disability insurance and supplemental security income benefits alleging disability to work beginning on December 28, 2005, due to arthritis, depression and post traumatic stress disorder among other conditions. She requested a hearing by an Administrative Law Judge on the first set of applications but then failed to appear.  She did not request a hearing on the second set of applications.  There is no reason to reopen these prior applications because the decision on the current set of applications is unfavorable." (Tr. at 12).  Plaintiff's last insured date was June 30, 2011 (Tr. at 12, 14).

Step one.  Plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 14).  The work performed after this date did not rise to the level of substantial gainful activity (Tr. at 14).

Step two.  Plaintiff has the following severe impairments:  arthritis, obesity, fibromyalgia, depression, anxiety and post traumatic stress disorder (Tr. at 14).

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 15-17).

Step four.  Plaintiff retains the residual functional capacity to lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently.  She can stand or walk for 6 hours per day and sit for 6 hours per day.  She can occasionally climb ramps and stairs

but can never climb ladders, ropes or scaffolds.  She can occasionally stoop, kneel,

crouch and crawl.  She can frequently handle and finger.  She must avoid hazards such

as dangerous machinery and unprotected heights.  She can perform simple and routine

tasks with no more than occasional interaction with the general public (Tr. at 17).

Plaintiff has no past relevant work (Tr. at 21).

Step five.  Plaintiff is capable of performing work available in significant numbers

such as laundry classifier, fruit distributor, and small products assembler (Tr. at 22).

Therefore she is not disabled (Tr. at 23).

## VI.    ANALYSIS

### PLAINTIFF'S LEGAL ARGUMENTS

I am having difficulty pinpointing plaintiff's precise challenges to the ALJ's

opinion, other than to conclude that plaintiff believes the ALJ is wrong in finding that she

is not disabled.

> The ALJ['s] findings constitute generalizations which boil down to a single
> illogical point:  Michelle's condition is not as bad as it could be and, therefore, is
> not as bad as she claims.  Plaintiff responds further simply by directing this
> Court's attention to this brief's resume of Michelle's medical history and contends
> that this record supports the following conclusions:
> - Objective data in the form of X-rays have revealed mild scoliosis and
> incomplete fusion at L5-S1 causing pseudo arthrosis; X-rays of her right hip have
> shown early mild degenerative changes.
> - Michelle has been diagnosed with Fibromyalgia.
> - The aforementioned conditions and others identified in the medical
> records are known to cause severe pain and disability.
> - Physicians have seen fit to address Michelle's pain with epidural steroid
> injections and multiple medications.

From this argument, it appears that plaintiff is doing precisely what she

complains the ALJ is not permitted to do -- make medical inferences without the aid of

an expert, and conclude that because the conditions plaintiff claims she has *can be* disabling, her conditions *are* disabling.

Before proceeding to an analysis of the sequential evaluation, I will address the cases cited by plaintiff in support of her argument. Plaintiff states that an ALJ may not draw upon his own inferences from medical reports, citing Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000). In that case, the Eighth Circuit held that:

> In the case at bar, there is no medical evidence about how Nevland's impairments affect his ability to function now. The ALJ relied on the opinions of non-treating, non-examining physicians who reviewed the reports of the treating physicians to form an opinion of Nevland's RFC. In our opinion, this does not satisfy the ALJ's duty to fully and fairly develop the record. The opinions of doctors who have not examined the claimant ordinarily do not constitute substantial evidence on the record as a whole. Likewise, the testimony of a vocational expert who responds to a hypothetical based on such evidence is not substantial evidence upon which to base a denial of benefits. In our opinion, the ALJ should have sought such an opinion from Nevland's treating physicians or, in the alternative, ordered consultative examinations, including psychiatric and/or psychological evaluations to assess Nevland's mental and physical residual functional capacity. As this Court said in Lund v. Weinberger, "An administrative law judge may not draw upon his own inferences from medical reports."

Id. (citations omitted). As discussed more fully below, I find that the ALJ's analysis does not conflict with any opinion or treatment record by plaintiff's treating physicians.

Plaintiff cites Estabrook v. Apfel, 14 F. Supp. 2d 1115, 1122 (S.D. Iowa 1998), to support her argument that the ALJ is not permitted to substitute his opinion for those of physicians. In Estabrook, the ALJ ignored the opinions of plaintiff's treating physicians regarding plaintiff's functional restrictions and instead relied on the opinion of a non-examining, non-treating physician, contrary to Eighth Circuit law. Such was not the case here -- in fact, the ALJ specifically pointed out that none of plaintiff's treating

38

doctors even suggested that her functioning was limited to the point of disability. The only contrary evidence in the entire record is plaintiff's testimony.

Plaintiff cites <u>Simpson v. Callahan</u>, 979 F. Supp. 1264, 1269 (E.D. Mo. 1997), with the following quotation: "It is within the decision authority of the ALJ to discredit an expert's opinion; it is entirely outside the ALJ's competency to render a psychological opinion that a claimant suffers from 'no severe functional limitation in regard to an adjustment disorder.'" Plaintiff does not explain how the holding of this case supports any argument in her brief.

Finally, plaintiff cites <u>Ormon v. Astrue</u>, 497 Fed. Appx. 81 (1st Cir., Sept. 7, 2012),

> holding that an ALJ could not make an RFC assessment based on the bare medical record and that an "ALJ, as a lay person, was not qualified to make such a determination on his own in the circumstances of this case."

Plaintiff's citation is a bit misleading. The entire sentence written by the court is as follows: "As just discussed, no doctor determined that claimant was malingering, and the ALJ, as a lay person, was not qualified to make such a determination on his own in the circumstances of this case." The court did not hold that an ALJ cannot make an RFC assessment based on the "bare medical record."

Plaintiff concludes the discussion of these cases as follows:

> The upstart of the above-indited cases is that it is beyond the competency of an ALJ, unaided by expert medical opinion to interpret medical records on his own and draw medical inferences from those records that a claimant does not suffer from a severe functional limitation. Thus, although, on the one hand, the ALJ may find a basis for impeaching Michelle's credibility, for example, in her own inconsistent statements or conduct and conclude that because of her lack of credibility her allegations about pain are to be discounted, the basis of that

39

impeachment, on the other hand, cannot simply be an ALJ's interpretation of medical records on questions beyond the ALJ's ken.

Is plaintiff challenging the ALJ's finding that "claimant does not suffer from a severe functional limitation"? Is plaintiff arguing that the same evidence used to find a claimant not credible cannot be used to analyze medical records? I do not know -- the remainder of plaintiff's brief on this issue consists of a paragraph of questions. The heading in plaintiff's brief for issue number one is: "The ALJ erred in interpreting Michelle's medical records with reference to pain and mental symptoms without the aid of expert medical testimony because their interpretation was beyond his competency," and the conclusion is that "the ALJ erred in discounting Plaintiff's credibility based upon his interpretation of the medical records without the aid of an expert witness." Because the third issue challenges the credibility determination, I am at a loss as to what plaintiff's complaint is in this first section. My review of the arguments presented in issues 2 and 3 leads me to conclude that plaintiff's sole argument in her brief is that the ALJ erred in discrediting plaintiff's subject complaints, regardless of whether he did it without the assistance of a medical expert.

Plaintiff does not challenge the finding at step one, that she has not engaged in substantial gainful activity since her alleged onset date.

Plaintiff does not challenge the finding at step two, that she suffers from the following severe impairments: arthritis, obesity, fibromyalgia, depression, anxiety and post traumatic stress disorder. In fact, plaintiff describes this finding as "undisputed" (see plaintiff's brief at page 37, reply brief at page 3).

40

Plaintiff does not challenge the finding at step three, that plaintiff's impairments do not meet or equal a listed impairment.

I cannot find any argument in plaintiff's brief or reply challenging the ALJ's residual functional capacity assessment. Although she challenges the ALJ's credibility determination on the ground that it was improper to rely on the fact that plaintiff has overcome substance abuse and apparently on the ground that a medical expert did not interpret the medical records for the ALJ, plaintiff never identifies any functional ability about which she believes the ALJ was wrong. Therefore, I turn to the transcript of the administrative hearing to compare plaintiff's testimony to the residual functional capacity assessment of the ALJ.

The ALJ found that plaintiff can lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently. Plaintiff did not provide any testimony about her ability to lift, carry, push or pull. She did not mention this functional ability in her brief or her reply. The medical records establish that she experienced back pain from lifting her son who was 7 or 8 at the time, clearly more than 20 pounds. There is no other evidence that plaintiff experienced any problems with lifting, except on an occasional basis when her lifting was restricted for a day or two.

The ALJ found that plaintiff can stand or walk for 6 hours per day. Plaintiff testified that she can stand or walk for 30 to 45 minutes at a time. She did not testify about how long she can stand or walk during an 8-hour work day. She did not allege in her brief or her reply brief that she cannot stand or walk for a total of 6 hours per day.

The ALJ found that plaintiff can sit for 6 hours per day.  Plaintiff testified that she can sit for 45 minutes at a time. She did not testify about how much of an 8-hour work day she would be able to sit.  She did not allege this in her brief or her reply.  She has never alleged that she cannot sit for a total of 6 hours during an 8-hour work day.

The ALJ found that plaintiff can occasionally climb ramps and stairs but can never climb ladders, ropes or scaffolds. Plaintiff did not testify about climbing; she did not mention it in her brief or her reply.

The ALJ found that plaintiff can occasionally stoop, kneel, crouch and crawl.  Plaintiff did not testify about any of these abilities.  She did not mention them in her pleadings.

The ALJ found that plaintiff can frequently handle and finger.  Plaintiff did not testify about how often she can handle or finger.  Plaintiff testified that her hands will sometimes lock up where she cannot close them.  Her doctor said that is related to arthritis, and she was advised to use heat and a muscle relaxing cream.  She experiences these hand cramps one to three times a day, especially if she holds her hand a certain way too long or tries to write.

The medical records do not support this testimony.  During a face-to-face meeting with a disability counselor on June 18, 2010, plaintiff was observed to have no difficulty writing or using her hands.  On May 31, 2011, plaintiff told her psychiatrist that her fingers will swell during the night but go down during the day. There is no other allegation in any medical record of difficulty with plaintiff's hands or fingers, and even in this one instance plaintiff did not claim that her hands cramp or lock up so that she

cannot close her fingers. In addition, she testified that Dr. Islam treated her for her hand problem; however, Dr. Shaw is the person to whom she reported the swollen fingers. There is no mention in the records from Fulton Medical Clinic where Dr. Islam practices which discuss an allegation, observation, diagnosis or treatment for plaintiff's hands or fingers.

The ALJ found that plaintiff must avoid hazards such as dangerous machinery and unprotected heights. Plaintiff did not testify about any of this and did not mention it in her pleadings.

The ALJ found that plaintiff is limited to simple and routine tasks. Plaintiff testified that she has had anxiety her entire life, that the stress of being responsible for day-to-day tasks freaks her out, that the stress of telling people what to do and doing paperwork causes her anxiety. Plaintiff does not argue that the limitation of simple and routine tasks is not sufficient to address her testimony about anxiety.

The ALJ found that plaintiff can have no more than occasional interaction with the general public. Plaintiff testified that she had panic attacks when she had to work the drive-through at McDonald's and that big crowds cause her stress. She has not argued that the limitation of only occasional interaction with the general public is not sufficient to address her testimony about panic attacks and stress caused by being around too many people.

Based on the above, I find that the only functional ability the ALJ found plaintiff can do but which plaintiff testified she cannot is her ability to handle and finger. The ALJ found that plaintiff can frequently handle and finger. Plaintiff testified that her hands will

sometimes lock up where she cannot close them. She experiences these hand cramps one to three times a day, especially if she holds her hand a certain way too long or tries to write. Plaintiff did not testify about how long these hand problems last when they occur. Because, as discussed above, the medical records contradict plaintiff's testimony on this issue, her challenge to the ALJ's finding on the issue of residual functional capacity is meritless.

## VII.    CREDIBILITY OF PLAINTIFF

Plaintiff challenges the ALJ's credibility determination by arguing that the ALJ erred in not accepting plaintiff's testimony that she is disabled. I note here that no one elicited testimony from the vocational expert regarding available jobs if plaintiff's testimony about her limitations were found to be credible. Therefore, I will proceed under the assumption that plaintiff's described impairments would prevent her from doing any job.

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the

Case 2:14-cv-04107-REL   Document 22   Filed 05/29/15   Page 44 of 48

court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

Plaintiff argues that the ALJ improperly assessed plaintiff's prior work record and reasons for leaving the work force and applying for disability. The record outlined above establishes that plaintiff has had very low earnings her entire life. She provided different reasons for her inability to keep her job at McDonald's, from anxiety dealing with people, conflicts with her boss, an inability to lift and stand, and lack of

45

transportation.  The records also establish that plaintiff's diagnoses consistently included money problems, and she was advised by her caseworker both to apply for disability and to look for a job -- both solutions to her money problems.  This factor supports the ALJ's credibility determination.

Since her alleged onset date, plaintiff's daily activities have included doing housework and laundry, swimming in a creek, hanging out in a pool hall/bar, dancing with friends, and lifting a 27-inch television set.  This factor supports the ALJ's credibility determination.

Although plaintiff alleges that she was treated with epidural steroid injections, I was not able to find such a reference in the medical records.  Plaintiff never saw an orthopedic specialist for her back or joint problems.  Her physical problems were described more severe by her mental health provider than by her physical health providers.  Although the record is clear that plaintiff experiences both physical and mental symptoms, the ALJ's residual functional capacity assessment takes those limitations into account and found only that plaintiff's description of the severity of her symptoms beyond those were not credible.

Precipitating and aggravating factors include drug and alcohol use and situational factors such as plaintiff's increased depression and mental symptoms when her boyfriend was incarcerated.  Other precipitating and aggravating factors are taken into consideration in the ALJ's residual functional capacity assessment.

The record establishes that plaintiff's symptoms are described as stable when she takes her medication regularly and refrains from using drugs and alcohol.  The fact

that she claims not to be able to afford her medication at times is contradicted by her continued smoking along with medications from the $4 list being prescribed by her doctors in order to keep her costs down.

The record includes very few functional restrictions. When plaintiff's activities were limited by her doctors, the restrictions were not due to plaintiff's allegedly disabling impairments but because of some one-time incident such as dropping a television set on her foot or falling on ice.

In addition to these factors, I note that there are multiple instances in the record of plaintiff telling doctors that she has no history of illegal drug use when that was clearly incorrect. The record reflects instances when plaintiff's reports were inconsistent or when she lied to treatment providers (such as when she claimed a family member was waiting for her outside when she was holding her keys and her car was observed to be empty).

I find that the substantial evidence in the record supports the ALJ's finding that plaintiff's testimony that her symptoms prevent her from working is not fully credible.

## VIII.  CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
May 29, 2015

Case 2:14-cv-04107-REL   Document 22   Filed 05/29/15   Page 48 of 48